UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CURTIS E. PEARSON, | ) |
|     Plaintiff, | ) Case No. 12 C 8574 |
| | ) |
| v. | ) Magistrate Judge Sidney I. Schenkier |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

Curtis E. Pearson seeks reversal and remand of a determination by the Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying him Disability Insurance Benefits ("DIB") from October 22, 2004 to February 25, 2009 (doc. # 19). The Commissioner has filed a motion seeking summary affirmance of the decision denying benefits (doc. # 26). For the following reasons, the Court grants Mr. Pearson's motion for remand and denies the Commissioner's motion to affirm.

### I.

On July 30, 2008, when he was 44 years old, Mr. Pearson filed his application for DIB, alleging that he became disabled on October 22, 2004 due to a back injury (R. 103). His claim was denied initially and upon reconsideration; thereafter, on November 17, 2010, an Administrative Law Judge ("ALJ") held a hearing (R. 15). On December 8, 2010, the ALJ issued a written opinion concluding that Mr. Pearson was disabled from February 26, 2009 through September 30, 2011, his date late insured, but that Mr. Pearson was not disabled or entitled to benefits prior to February 26, 2009 (R. 26).

---

[1] On January 24, 2013, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (docs. ## 10, 12).

## II.

Prior to his alleged onset date, Mr. Pearson worked primarily as a sales engineer, selling IT services and designing data networks for business units (R. 39, 42). On October 22, 2004, he stooped under his desk at work to plug in his laptop and hit his back (R. 44-45). Afterward, he felt a burning, aching, stabbing pain in his groin, legs, and lower back (R. 44, 350). Mr. Pearson returned to work only briefly after the accident (R. 39-41, 80).

A November 1, 2004 MRI revealed a herniated disc at L4-L5 on the right side, and on November 8, 2004, Mr. Pearson visited a pain clinic complaining of severe back pain on his right side (R. 804, 808). Dr. Giri Gireesan, M.D., observed that while his gait was normal and he had 5/5 strength in his extremities, Mr. Pearson had increased pain in the back area with flexion, extension, and lateral rotations (R. 808). Dr. Gireesan recommended that Mr. Pearson undergo a course of three epidural steroid injections to try to alleviate his pain (*Id.*). Dr. Rom Stevens performed three injections over three weeks, and reported that Mr. Pearson had 50 to 80 percent pain relief (R. 855-57).

Mr. Pearson reported to Dr. Gireesan, however, that the injections did not provide significant pain relief, and Mr. Pearson requested surgery (R. 843). Dr. Gireesan ordered a follow-up MRI on December 3, 2004, which showed a bulging, not herniated disc (R. 842). Dr. Gireesan recommended physical therapy instead of back surgery, and advised Mr. Pearson's primary care physician that Mr. Pearson may require a medical workup to determine other possible causes for his pain (*Id.*). Mr. Pearson attended physical therapy and took anti-inflammatories and muscle relaxers, but his severe back pain continued (R. 45, 841).

On December 16, 2004, Mr. Pearson visited a hematologist, Dr. Anaadriana Zakarija, to evaluate the effects that back surgery would have on his sickle cell disease (diagnosed in 1987)

2

(R. 427).² Dr. Zakarija warned that back surgery could result in the development of sickle cell crises (R. 429).³

On February 24, 2005, Dr. Matthew Hepler, an orthopedic surgeon, examined Mr. Pearson for the first time. Mr. Pearson described having an aching, stabbing pain, rated at 10/10, across his lower back and radiating down both legs (R. 440). The pain continued without relief despite a wide range of non-operative treatment, including injections, anti-inflammatories, pain medications, and physical therapy (*Id.*). Dr. Hepler noted that Mr. Pearson had decreased range of motion and pain on flexion in his spine, and straight leg raises were positive for pain (R. 441). Dr. Hepler diagnosed him with L4-5 disc herniation and right L4-5 radicular pain (R. 441-42).

After discussing with Dr. Zakarija the risks that surgery posed due to Mr. Pearson's sickle cell trait, Dr. Hepler and Mr. Pearson decided to proceed with surgical treatment since the non-surgical treatments had not provided Mr. Pearson with lasting pain relief (R. 496). On March 31, 2005, Dr. Hepler performed a microdiskectomy on Mr. Pearson, which removed the damaged portion of his herniated disk (R. 495-97).⁴ At a post-operative visit on April 15, 2005, while still on Norco, Mr. Pearson told Dr. Hepler that his groin pain was much better and his right leg pain was about 25 percent better, but he was still experiencing pain in his right calf and foot (R. 341). By May 16, 2005, Mr. Pearson stated that his groin pain was essentially gone and his leg pain was 20 percent better than before surgery (R. 338). At that time, he was still taking Norco, Ultram, and Neurontin for pain (*Id.*).

---

²Sickle cell disease causes a body to make sickle-shaped red blood cells that can get stuck in blood vessels. www.nhlbi.nih.gov/health/health-topics/topics/sca/; www.hopkinsmedicine.org/wilmer/research/lutty/sic_ret.html.

³Sickle cell crises occur when sickled red blood cells block blood flow to the limbs and organs causing sudden pain throughout the body that can affect the bones, lungs, abdomen, and joints. *See* http://www.nhlbi.nih.gov/health/health-topics/topics/sca/signs.html.

⁴http://www.mayoclinic.org/tests-procedures/diskectomy/basics/definitions/prc-20013864.

3

On May 27, 2005, Mr. Pearson was admitted to the hospital for vomiting blood and blood in his stool (R. 504). On June 16, 2005, Mr. Pearson followed up with Dr. Zakarija, complaining of abdominal pain, intermittent night sweats and headaches, and an elevated white blood cell count (R. 416). Dr. Zakarija noted that "most concerning" was Mr. Pearson's abdominal pain and "tender hepatosplenomegaly," or enlarged liver and spleen (R. 417). *See* http://www.nlm.nih.gov/medlineplus/ency/article/003275.htm.

Mr. Pearson saw Dr. Hepler again on July 8, 2005. He told Dr. Hepler that his leg symptoms were essentially resolved, but he still had pain in his buttock and back, which was aggravated with activity (R. 335). There were "no big changes" at his next appointment with Dr. Hepler, on September 7, 2005 (R. 332-34).

On October 5, 2005, however, Mr. Pearson reported to Dr. Hepler that in the last few weeks there had been a flare-up of his pain: his right back pain was radiating into his right groin, which was aggravated by bending and twisting (R. 330). Dr. Hepler's physical examination revealed that Mr. Pearson had decreased back range of motion, pain on flexion, and pain when he raised his right leg (*Id.*).

On January 9, 2006, Mr. Pearson continued to complain of lower back pain, which worsened during long periods of standing or sitting (R. 327). Dr. Hepler noted decreased back range of motion and pain on flexion and extension, and Mr. Pearson reported being unable to sit for more than 15 minutes (*Id.*). Dr. Hepler recommended non-surgical, chronic pain management (*Id.*). On a worker's compensation form, Dr. Hepler wrote that Mr. Pearson was to lift no more than 15 to 25 pounds; should avoid repetitive stooping, twisting, squatting, and kneeling; and was to avoid prolonged standing, walking, and sitting as well as driving more than ten miles per day (R. 866). Later that month, an MRI of Mr. Pearson's lumbar spine showed scar

4

tissue surrounding the right L4 and L5 nerve roots, which Dr. Hepler opined could produce back pain (R. 371).

In March 2006, Mr. Pearson was admitted to the hospital with pain in his chest, abdomen, and back, and a CT scan showed a significantly calcified spleen (R. 406-07). In November 2006, Mr. Pearson again went to the hospital complaining of severe abdominal pain (R. 528), and on July 19, 2007, Mr. Pearson was admitted to the hospital with severe abdominal pain consistent with inflammation of the gall bladder, which he had removed on July 21, 2007 (R. 544). The attending physician opined that Mr. Pearson's calcified spleen was probably associated with his sickle cell disease, and the physician noted that Mr. Pearson had been to the hospital on July 18, 2007, complaining of chronic low back pain (R. 545-46).

In addition, Mr. Pearson testified that his vision, which had begun to worsen in 2003 or 2004, had further deteriorated after his microdiskectomy (R. 44). Mr. Pearson underwent laser photocoagulation (to heal abnormal blood vessels) in the retina of his right eye in October 2007, and again in March 2008 (R. 615). On March 24, 2008, Mr. Pearson complained of redness, floaters, and decreased vision in his right eye (R. 593). A report from Retina Associates noted that Mr. Pearson had a history of sickle cell retinopathy,[5] macular pucker,[6] and fibrovascular proliferation[7] (R. 592). Mr. Pearson returned to Retina Associates on September 9, 2008, stating that he had suddenly lost vision in his right eye two days earlier, and he was suffering pain and photophobia (R. 615, 617). He was diagnosed with sickle cell retinopathy in both eyes (R. 615). Mr. Pearson followed up with ophthalmologist Dr. Sohail Hasan later that month, and while Dr.

---

[5]Sickle cell retinopathy is a condition caused by sickle cell disease when the sickle-shaped cells get stuck in blood vessels in the retina. http://www.hopkinsmedicine.org/wilmer/research/lutty/sic_ret.html.

[6]Macular pucker is scar tissue in the retina. http://www.nei.nih.gov/Health/pucker/index.asp.

[7]Fibrovascular proliferation is the accumulation of fibrovascular tissue over the surface of the retina. http://dro.hs.columbia.edu/pdr.htm.

Hasan stressed that the prognosis for surgery was "guarded," they resolved to schedule surgery (R. 613-14).

Mr. Pearson was declared legally blind by the Cook County Bureau of Health Services on October 9, 2008 (R. 595-96). On November 6, 2008, Dr. Hasan diagnosed him with sickle cell retinopathy with traction retinal detachment in his right eye,[8] and scheduled Mr. Pearson for surgery (R. 600). Dr. Hasan performed the surgery on December 5, 2008, but after surgery, Mr. Pearson continued to suffer from flashes, floaters, mild pain, and headaches (R. 639-40). In addition, Mr. Pearson's vision did not improve post-operatively; Dr. Hasan opined that this was due to previous damage from the sickle cell retinopathy and a dense cataract (R. 673). Dr. Hasan noted that the vision in Mr. Pearson's left eye was also continuing to worsen (*Id.*).

At his examination on December 26, 2008, Dr. Hasan concluded that due to his visual limitations, Mr. Pearson could never perform activities that required good eye and hand coordination, distant or detailed vision, or reading fine print (R. 632-34). In addition, Dr. Hasan opined that Mr. Pearson could never bend, stoop, ambulate, or drive safely (R. 636). He further concluded that Mr. Pearson's function or employability would not be improved by any further treatment or appliance (R. 635).

Dr. M. S. Patil conducted a physical consultative examination of Mr. Pearson for the Bureau of Disability Determination Services ("DDS") on January 21, 2009. Mr. Pearson complained of constant severe pain in his back (for which he reported taking Vicodin daily), recurrent numbness in his left leg, no vision in his right eye, and poor vision in his left (R. 621). Dr. Patil reported that Mr. Pearson had no light perception in his right eye and had left eye visual

---

[8] Retinal detachment is a separation of the retina from its supporting layers. With tractional detachment, when the retina becomes detached, bleeding from nearby blood vessels can cloud the inside of the eye. http://www.nlm.nih.gov/medlineplus/ency/article/001027.htm.

acuity of 20/100,[9] and his attention and concentration was fair to poor (R. 622). Further, Dr. Patil recorded that Mr. Pearson had some limitations in his range of motion in his back and difficulty with squats and rises, but otherwise normal gait and strength (R. 623-24).

Mr. Pearson's complaints of pain continued in February 2009. On February 6, 2009, at his initial appointment with Dr. Jeffrey Nichols, a neuro-ophthalmologist to whom Dr. Hasan referred him, he reported decreasing vision and shooting pain around his eyes (R. 645). On February 26, 2009, Mr. Pearson reported that he had thigh pain, which Dr. Zakarija opined may be related to a sickle cell crisis (R. 661, 665).

In March 2009, state agency medical consultant Dr. Charles Kenney reviewed the record and found Mr. Pearson was capable of lifting and carrying up to 20 pounds occasionally and 10 pounds frequently and standing, walking, or sitting a total of six hours in an eight-hour workday, but no climbing ladders, ropes, and scaffolds, and only occasionally climbing ramps and stairs, stooping, kneeling, crouching, or crawling (R. 647-50). Dr. Kenney reported that Mr. Pearson's visual impairments limited only his near acuity, and he did not add visual limitations (R. 649). Dr. Kenney found Mr. Pearson was not fully credible "given the differences in his visual acuity and the % of false negatives on the Humphrey (visual field exam)" (R. 653).

After a visit on May 19, 2009, Dr. Zakarija reported that Mr. Pearson had "rare pain crises throughout his life" related to his sickle cell disease (R. 664). By contrast, on June 4, 2009, Dr. Zakarija reported that Mr. Pearson had developed vision loss over the previous two years due to his chronic sickle cell disease, and that he suffered "recurrent pain crises" due to sickle cell

---

[9] Low vision is defined as the best-corrected visual acuity less than 20/40 in the better-seeing eye. http://www.nei.nih.gov/eyedata/lowvision.asp. The U.S. definition of blindness is the best-corrected visual acuity less than 20/200 in the better-seeing eye. http://www.nei.nih.gov/eyedata/blind.asp.

disease (R. 660). And, on June 8, 2009, Dr. Hasan reported that Mr. Pearson's vision continued to be painful, red, light-sensitive, and blurred (R. 669).

On August 14, 2009, David Hillman, M.D., conducted an Ophthalmology Consultative Examination of Mr. Pearson for DDS (R. 676). He observed that Mr. Pearson had no light perception in the right eye, 20/100 in the left eye, and cataracts in both eyes but worse in the right eye (R. 676-77). On September 17, 2009, state agency consultant Julio Pardo, M.D., determined that Mr. Pearson's condition met Listing 2.03B (relating to loss of visual field efficiency) with an onset date of disability of May 14, 2009 (R. 681). Dr. Pardo reasoned that the August 14, 2009 vision testing showed a disabling decrease in Mr. Pearson's vision, which Dr. Pardo assumed began gradually three months prior to the testing (R. 683).

On October 20, 2009, however, state agency consultant Jerda Riley, M.D., reviewed the record and determined that Mr. Pearson did not meet Listing 2.03B because the medical evidence showed inconsistent findings, fluctuating visual acuities, and high false negatives in vision testing for Mr. Pearson's left eye (R. 686). Nevertheless, Dr. Riley found that "the fact remains the claimant has significant retinal vaso-occlusive disease" in both eyes,[10] and that Mr. Pearson met Listing 7.05A, related to sickle cell disease (*Id.*). Dr. Riley gave controlling weight to Mr. Pearson's treating hematologist, Dr. Zakarija, who diagnosed Mr. Pearson with recurrent sickle cell pain crises related to Mr. Pearson's thigh pain, abnormal retinal findings, headaches, and calcified spleen (*Id.*). Dr. Riley opined that Mr. Pearson met Listing 7.05A as of February 26, 2009 based on Dr. Zakarija's June 4, 2009 report (*Id.*).

## III.

On November 17, 2010, a hearing was held before the ALJ at which Mr. Pearson (represented by counsel), his wife, and a VE testified. Mr. Pearson testified that he has not been

---

[10]Vaso-occlusive disease is another name for sickle cell disease.

8

pain-free since his October 22, 2004 accident (R. 65). He experiences numbness, burning, and radiating back pain every day which spreads to his legs, and 80 percent of his days are "bad days" due to the pain (R. 46, 76). Mr. Pearson has taken Oxycontin, Norco, Celebrex, Tylenol 3, and Voltaren for the pain, but the medicine only allows him to rest and does not stop the pain, and he has side effects including hives and vomiting (R. 46-48). Mr. Pearson testified that he has sickle cell crises about twice a month, during which he experiences throbbing pain, locking up of his joints, shaking, and fever (R. 68).

Since the back injury, Mr. Pearson testified that he has been limited to walking half a block, standing for 10 minutes, sitting for 25 minutes, and lifting 10 pounds, but he feels fatigued after such activities and fears the onset of sickle cell crises (R. 49-50). He also has trouble bending, stooping, squatting, using his left arm, and sleeping (R. 50-51). He has limitations on his driver's license, but due to his vision loss he does not drive at all (R. 38). Mr. Pearson also no longer attends his children's extracurricular activities, and he does not attend church as often as he used to (R. 51, 53-55).

Mr. Pearson's wife has done most of the driving since Mr. Pearson's injury, and she has always done the household chores (R. 87-88). She testified that his medications make him sick, and he is in constant pain, making it difficult for him to sleep (R. 84-86). Mrs. Pearson also testified that her husband used to be very active but now is primarily idle at home (R. 84).

The VE testified that Mr. Pearson's past work most closely resembled a sales engineer, selling IT services, generally performed at a light level of exertion but at the high end of skilled work (R. 91). The ALJ presented a hypothetical claimant of the same age, education, and work experience as Mr. Pearson, who has the RFC to perform the full range of light work, but who must avoid concentrated exposure to hazards due to his vision problems (R. 91-92). The VE

9

responded that the hypothetical individual could not perform the claimant's past relevant work because it involved driving and traveling, but the individual could perform other unskilled, light work (R. 92). The VE further testified that if the claimant was limited to unskilled, sedentary work, there would be jobs available (*Id.*). However, a claimant who was off-task more than 20 percent of the work day (due to pain, needing to frequently alter his position, or difficulty sustaining focus and concentration) could not sustain gainful employment (*Id.*).

### IV.

On December 8, 2010, the ALJ issued a written opinion finding that Mr. Pearson was not disabled prior to February 26, 2009 (R. 12-26). In evaluating his claim, the ALJ applied the familiar five-step sequential inquiry for determining disability, which required her to analyze whether the claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment that meets or equals one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) can perform his past work; and (5) is capable of performing other work in the national economy. *See* 20 C.F.R. §404.1520(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

At Step 1, the ALJ found Mr. Pearson had not engaged in substantial gainful employment since October 22, 2004 (R. 17). At Step 2, she found that Mr. Pearson had the following severe impairments: degenerative disc disease; sickle cell disease; sickle cell retinopathy; a history of mild cardiomyopathy; and obesity (*Id.*). Next, at Step 3, the ALJ ruled that prior to February 26, 2009, Mr. Pearson did not have an impairment or combination of impairments that met or medically equaled the severity of any listed impairments, including Listings 1.04 (disorders of the spine), 4.00 (cardiovascular system), and 7.05 (sickle cell disease) (R. 17-18). The ALJ then determined that prior to February 26, 2009, Mr. Pearson had an RFC to "perform sedentary

work . . . except that he can occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl; can never climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to hazards and unprotected heights" (*Id.*).

In determining his RFC, the ALJ first reviewed Mr. Pearson's testimony, including that he suffered sickle cell crises – throbbing joint pain, shaking, and fever – about twice a month, and he suffers radiating pain every day which is not relieved by heavy pain medication, such that he can only stand for approximately 10 minutes and sit for 25 minutes at a time (R. 19-20). The ALJ found Mr. Pearson's allegations concerning the intensity, persistence, and limiting effects of his symptoms "not fully credible." The ALJ explained that Mr. Pearson experienced improvement after his back surgery, and a physical consultative examination and subsequent x-rays were mostly normal (R. 23). In addition, the ALJ found that Mr. Pearson's complaints about sickle cell crises were intermittent, and according to his "treating doctor," they did not occur prior to 2009 (*Id.*). Furthermore, the ALJ stated that Mr. Pearson "did not begin to have more serious trouble with his vision until after February 2009" (*Id.*).

The ALJ next explained that, "[a]s for the opinion evidence, the record does not contain any opinions from any treating or examining physician indicating that the claimant is disabled or even has limitations greater than those identified in this decision prior to February 26, 2009" (R. 23). The ALJ gave "some weight" to Dr. Kenney's opinion, but concluded that Mr. Pearson was more exertionally limited than Dr. Kenney found (*Id.*). In addition, while Dr. Kenney indicated that Mr. Pearson was limited as to near acuity, the ALJ stated that Mr. Pearson's visual limitations did not substantially decline until after February 2009 (*Id.*).

At Step 4, the ALJ determined that Mr. Pearson could not perform his past relevant work (R. 24). Nevertheless, at Step 5, the ALJ found that even with an RFC that was less than the full

11

range of sedentary work prior to February 26, 2009, jobs existed in significant numbers in the national economy that Mr. Pearson could perform (R. 24-25).

The ALJ then concluded that beginning on February 26, 2009, the severity of Mr. Pearson's impairments medically equaled the criteria of Listing 7.05A (R. 25). In making this finding, the ALJ gave "great weight" to the October 20, 2009, opinion of state agency medical consultant Dr. Riley (*Id.*). Dr. Riley noted that Mr. Pearson's treating hematologist had diagnosed him with recurrent pain, headaches, and a calcified spleen due to vaso-occlusive pain crises (*Id.*). The ALJ found that Mr. Pearson's conditions progressed to the point of severity of the Listing on February 26, 2009, at which point he became disabled (R. 25-26).

## V.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision. *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013). We do not reweigh the evidence or substitute our judgment for that of the ALJ. *Id.* at 362. A decision denying benefits need not address every piece of evidence, but the ALJ must provide "an accurate and logical bridge" between the evidence and her conclusion that a claimant is not disabled. *Kastner*, 697 F.3d at 646. Mr. Pearson argues that the ALJ improperly assessed his RFC, his visual limitations, and his credibility. For the reasons set forth below, we conclude that a remand is necessary.

Mr. Pearson argues that the ALJ improperly assessed his RFC because the ALJ ignored and misconstrued his treating physicians' opinions and medical records (doc. # 19: Pl.'s Br. in Supp. of Reversal at 6). "A treating physician's medical opinion is entitled to controlling weight if it is well supported by objective medical evidence and consistent with other substantial evidence in the record." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). If the ALJ does not

give a treating physician's opinion controlling weight, she must give a sound reason for rejecting it and adopting another doctor's opinion. *Id.* at 636-37.

In this case, with respect to the physician opinions on medical evidence preceding February 26, 2009, the ALJ only assigned weight to the RFC opinion of state agency consultant, Dr. Kenney. The ALJ assigned only "some weight" to Dr. Kenney's opinion because while Dr. Kenney opined that Mr. Pearson could perform work within the range of light work, the ALJ limited Mr. Pearson's RFC to sedentary work, with some additional limitations (R. 23). As for the other medical opinion evidence, the ALJ summarily concluded that "the record does not contain any opinions from any treating or examining physician" indicating that Mr. Pearson was more limited than the ALJ found (*Id.*).

That conclusion misconstrues the record. The ALJ failed to assign weight to – or even discuss – opinions from Mr. Pearson's treating ophthalmologist (Dr. Hasan), treating orthopedic surgeon (Dr. Hepler), and treating hematologist (Dr. Zakarija) which concluded that Mr. Pearson is more limited than the ALJ found. Mr. Pearson visited Dr. Hepler repeatedly between his alleged onset date of disability and January 2006, complaining of pain in his lower back, groin, and legs. On January 9, 2006, which appears to be the last date in the record that Mr. Pearson visited Dr. Hepler (though not the last date Mr. Pearson complained of chronic lower back pain),[11] Dr. Hepler opined that Mr. Pearson would have to avoid prolonged standing, sitting, and driving due to pain stemming from his microdiskectomy (R. 866). In addition, Dr. Hepler noted that an MRI from that same month showed scar tissue surrounding the right L4 and L5 nerve roots, which was objective evidence that could support Mr. Pearson's claim of back pain and resulting limitations (R. 371). The ALJ, however, failed to address or assign any weight to Dr. Hepler's opinions, despite the ALJ's contrary conclusion that Mr. Pearson could perform a range

---

[11] For example, Mr. Pearson complained of chronic low back pain in July 2007 (R. 545-46).

13

of sedentary work. The ALJ's failure to consider Dr. Hepler's opinions requires remand. *See Bates v. Colvin*, 736 F.3d 1093, 1100 n.4 (7th Cir. 2013) ("although the ALJ need not defer to a doctor's opinion about a claimant's ability to work, it still cannot ignore the doctor's opinion when determining a claimant's RFC").

The ALJ also misconstrued and omitted relevant medical evidence related to Mr. Pearson's progressive vision loss. As with Mr. Pearson's degenerative disk disease, with regard to Mr. Pearson's vision loss, the ALJ only gave weight to Dr. Kenney's opinion. However, while the ALJ noted that Dr. Kenney indicated that Mr. Pearson would be limited as to near acuity, the ALJ concluded that "the evidence shows the claimant's visual limitations did not substantially decline until after February 2009" (R. 23). As Mr. Pearson points out (Pl.'s Br. at 10), this conclusion fails to account for Dr. Hasan's examinations finding that Mr. Pearson had severe visual limitations since at least March 2008 and that Mr. Pearson's vision did not improve even after surgery in December 2008 (*see, e.g.*, R. 592-93, 673). The ALJ also ignored Dr. Hasan's December 26, 2008 opinion that Mr. Pearson would never be able to bend, stoop, ambulate, or drive safely, or perform activities that required good eye and hand coordination, distant or detailed vision, or reading fine print (R. 632-36). Moreover, the ALJ failed to discuss Dr. Patil's January 2009 consultative examination finding that Mr. Pearson had no light perception in his right eye and left visual acuity of 20/100 (R. 621-22). As with Dr. Hepler, the ALJ's failure to address Mr. Pearson's treating ophthalmologist's opinion and Dr. Patil's examination as to his functional limitations requires remand. *See Roddy*, 705, F.3d at 636.

Additionally, the ALJ failed to assign weight to Dr. Zakarija's opinions. Dr. Zakarija has been Mr. Pearson's treating hematologist since December 2004. While Dr. Zakarija stated on May 19, 2009 that Mr. Pearson had "rare pain crises throughout his life" (R. 664), Dr. Zakarija

had noted with concern throughout the years that Mr. Pearson's severe abdominal pain, headaches, elevated white blood cell count, enlarged and calcified spleen, thigh pain, and vision troubles were related to his sickle cell disease (*see, e.g.*, R. 416-17). Dr. Zakarija also opined, on June 4, 2009, that Mr. Pearson's vision loss had begun two years prior due to his chronic sickle cell disease (R. 660). The ALJ's discussion of Dr. Zakarija, however, was limited to her conclusion that "the claimant's treating doctor documented that the claimant denied having any crises until 2009," and "that while his vision was generally decreasing, he did not begin to have more serious trouble with his vision until after February 2009" (R. 23). This conclusion misconstrues Dr. Zakarija's opinions and ignores the multiple instances of Mr. Pearson's pain and functional limitations that Dr. Zakarija reported prior to 2009. "An ALJ need not mention every piece of medical evidence in her opinion, but she cannot ignore a line of evidence contrary to her conclusion." *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). The ALJ's omission here requires remand.[12]

---

[12] In light of our decision to remand for further proceedings on the grounds discussed above, we do not reach plaintiff's challenge to the ALJ's credibility determination. We leave it to the ALJ's discretion, on remand, to consider the credibility issue anew. We express no view as to the outcome the ALJ should reach.

## CONCLUSION

Because the ALJ failed to address relevant medical opinions and reports, the ALJ's opinion failed to build "an accurate and logical bridge" between the evidence and her conclusion that Mr. Pearson was not disabled prior to February 26, 2009. *See Roddy*, 705 F.3d at 636. Thus, for the reasons set forth above, this Court grants Mr. Pearson's motion (doc. # 19), denies the Commissioner's motion (doc. # 26), and remands this case for proceedings consistent with this opinion. This case is terminated.

ENTER:

_____
SIDNEY I. SCHENKIER
United States Magistrate Judge

DATE: July 1, 2014